Welcome to the newly refurbished courtroom of the Third Circuit, recently completed. It doesn't look as much like a spaceship as I was told. That's a good thing. Welcome, everyone, and we have with us our dear colleague and highly esteemed colleague, Judge Aldisert, coming from Santa Barbara, California. Judge Aldisert, I have to tell you that this is one of the only times I've not been jealous of you sitting in Santa Barbara. The weather here is beautiful, and it's a very equitable climate here in eastern Pennsylvania, so you're not alone. Well, we tried to send you some Santa Barbara weather. I think you've succeeded, Rudy. Thank you. We'll call the first case for the afternoon, Zimmerman v. Norfolk Southern Corporation. Mr. Boyle. May it please the Court, my name is Dennis Boyle. I represent the appellant, Robert Zimmerman. I would like to request to reserve four minutes for rebuttal. Granted. May it please the Court, this case arises out of an accident that happened at a railroad intersection on June 12, 2008. On that date, Robert Zimmerman was riding his motorcycle towards a crossing. A train from Norfolk Southern was coming from his right-hand side as he observed the train. By the time he observed the train, it was so close he had no opportunity to avoid it. I think it's safe to say that the panel is well familiar with the facts here. And so in fairness to you and your client and the arguments and issues you've raised, we get right to those. And to some extent, I'm sure we'll be covering the facts because it's a state negligence law case and they're necessarily intertwined with some difficult preemption issues. With the indulgence of my colleagues, I'd like to, for my own benefit, clarify, count per count, the claims that have been made, which is to say I know how they've been denominated in the complaint, I've read the complaint, but to determine then theory of liability by theory of liability under the counts, what we're talking about for possible preemption purposes and what claim is being raised that was ruled upon by the District Court and that we might be reviewing for other purposes of disposition, not based on preemption. Do you follow me? I do, Your Honor, and I apologize for any confusion. No, no, not at all. It's because I think there's a certain amount of overlap here, too. So I'm not suggesting there's any failure on the part of a plaintiff or plaintiff's counsel. But count one is safely characterized as a failure to warn claim. Is that right? It is a failure to warn claim. And with respect to that failure to warn, we can isolate the lights and the horn separately, can we not, as factual issues? We can, Your Honor. You can't prevail on either of those theories, can you? Even as a matter of coming forward with some evidence irrespective of a preemption issue, what is in the record with respect to the use of lights and horn? We cannot prevail on that issue, Your Honor. All right, good enough. The other part of the failure to warn is an excessive rate of speed theory. Is that correct? That is correct. There's also a sight distance theory, we believe, in paragraph 39 of count one. All right. That's not count two? Also, it's mentioned in count two and count three as well. That's where the overlap comes in that I was referring to. Yeah, I believe it's mentioned in all three counts, but it is one theory of liability. But the excessive rate of speed theory as to count one is, if I'm reading the complaint correctly, essentially two-pronged. That is, that the track was actually a class one track, which seems to implicate or which does implicate certain facts here as to when and how and by whom some classification was made. And secondly, a theory that there was either intentional or negligent misclassification of the class. Am I correct there? Your Honor, to put more of a fine point on our theory there, I think the theory that we've enunciated is that the evidence submitted of track classification is ambiguous in that there are documents from Norfolk Southern that indicate three separate classifications. Well, I understand, but that's not answering my question as to what theory you have pled. My understanding is that the class is indeed an issue, but that you are saying that the class designation, first of all, was actually class one, and that you ought to be able to come forward with evidence to demonstrate that to overcome a motion for summary judgment. And that secondly, even if it wasn't a class one, that the designation was intentionally or negligently made, that it was misclassified. Am I misreading the complaint in that? No, I think that that is an accurate reading of the complaint. We believe that the classification was either a class one classification or that it was represented to the Federal Railroad Administration to be a class one classification. Which represented to the FRA. That's something that I wanted to pursue with both sides, and maybe my colleagues have picked up something that I have not been able to understand. Judge Chigueras, as a New Jersey boy, may not be aware of this, but Judge Aldersert, as a favorite son of Pittsburgh, is well aware of the fact that I'm from a railroad town, Altoona, Pennsylvania, and I have no idea how these things are classified. Never come across this problem before, and it wasn't entirely answered for me in reading the briefs. What is the process that is employed in actually designating a particular track for crossing purposes, a class one, class two, class three track for speed purposes? I'll attempt to answer that as best I can, although I'm not an expert on that specific field. The track classification, as I understand it, is established by the railroad based upon a number of factors, including the maintenance of the track, the number of ties that are used, the curvature of the track, those standards dictating how fast a train can safely operate on those tracks. Is this memorialized anywhere? I share the confusion. It seems like the railroads have an awful lot of authority there. Is this tradition or custom that the railroads do this, or is it actually memorialized somewhere? Is it actually memorialized that this is the railroad classification? No, no, no, no. In the CFR elsewhere, does it say the railroad shall make this determination? No. What the CFR does is it sets forth the standards for the particular classifications of tracks. But what about process? I mean, my confusion is what kind of process is used here for getting to that result? I think it's an internal process within the railroad. I think the railroad establishes what classification a track needs to be, and then it maintains tracks to meet that classification. Now, if I understand your position correctly, the district court kept out of evidence certain documents which you believe should rightfully be considered, and certain of those documents would show, at least one of them, if I recall, out of the, I think, ten different documents I looked at, indicated a Class I designation. Am I understanding your position to be that these accident reports and these reports filed with the FRA should all have come in, and if they came in there would be a question of fact as to the classification of the track? I believe so, Your Honor. The one is the U.S. Department of Transportation Inventory Documents. Those documents list the train speed that the trains are actually traveling over those tracks, and they all indicate a track speed of 10 miles per hour. For Class I? For Class I. Twenty-five is the maximum for Class II. Forty is the maximum for Class III. And there are ten accident reports. Four of those accident reports indicate that the classification of the track is Class I. There are four that indicate that it's Class II. There's one that indicates that it's Class III. So you're referring to the accident reports, but isn't it true that that spans a pretty big time period, right? It spans a period of 30 years. However, the corporate designee that Norfolk Southern produced indicated that there had been no change to the track classification over that time period. Well, how would a change be made? I don't really know. I asked the track supervisor that. Again, unless I'm missing something, what I'm left with is thinking that this is just some unilateral process where the railroad can designate what the classification ought to be. I think it is a unilateral process. The corporate designee said he was unsure as to how the classification was arrived at. Well, where's the negligence then? Pardon? Where is the negligence then in misqualifying, misclassifying? Where's the intentional conduct that would be tortuous in nature in misclassifying? Well, if the classification is as it's been reported to the FRA and the speed limit is class 1 and the speed limit is 10 miles per hour, then the negligence comes from the fact that they're exceeding the federally authorized speed limit because the train in this particular case was traveling 24 or 25 miles an hour. So if it should be classified class 2 or class 3, you have no negligence cause of action as to excessive speed? We do not have a negligence classification if it is indeed class 3 or class 4. However, Class 2. I'm sorry, class 2 or class 3. Because there's no factual dispute that the train was going 24 miles per hour and for the class 2 the max is 25. That's correct, Your Honor. However, what it does do is it does call into issue, we think, with the concept of federal preemption in that if the train speed is being misrepresented to the FRA, then the FRA doesn't have adequate information to determine what appropriate signalization should be there. Well, how does that work into your – how does that help you? I mean, it may be there's some sort of penalty scheme that I don't think it's anything you can benefit from, you know, falsely representing speeds or track conditions or whatever. How does that help you out? Well, how it helps us out or what it means is it means that the railroad signalization, which comes under the authority of the FRA, was inaccurate. The CFRs provide certain qualifications, certain things that a railroad has to do. One of those things that the railroad has to do is install gates and lights if there's a sight obstruction. The sight obstruction, in turn, is determined by the speed the trains are traveling and the speed on the railroad track. Judge Aldous, sir, do you have questions either relative to count one or anything else? No, I don't, and I think that if there's only 20 minutes left for – 20 minutes for argument, and I don't see any – and the contentions of the appellant on this issue, then I think we should move to another point. All right. Let's look at the count two claim then, Mr. Boyle. I think this is a failure to maintain a safe grade crossing, correct? Correct. Failure to maintain an adequate sight distance and the failure to maintain the railroad signs in accordance with the MUTCD. And I'll be interested to hear from your adversary on this point, but I assume that you take refuge in or that you rely upon our STRZC opinion, which holds that common law claims for failure to maintain a safe grade crossing are not preempted. I think that STRZC is controlling on this issue. There were discussions by the district court and in the appellee's brief about the fact that STRZC related to vegetation claims, and although that was a vegetation claim itself, what it relied upon was the duty to maintain a safe crossing and adequate sight distance. And there are a number of Pennsylvania cases going back 50 years requiring or imposing a duty on the railroads to have a safe sight distance. Baker, Johnson, Phelan, Boochecker, which we cite in our brief, all involved things other than vegetation. You know, Johnson involved a garage and telephone poles. Phelan involved a building. So what's involved here? Here is involved a sign and a building. What do you maintain that the railroad should have done about the building? Well, I think the railroad had a duty to take the building into effect in deciding how it was going to conduct its railroad operations. That's pretty vague. That's pretty vague. What are you talking about? What concrete actions does any duty imposed upon them by Pennsylvania law call for here? Well, they could have slowed the speed of their train to what they were reporting to the FRA. That doesn't require them to do anything with the obstruction with the building. That just says they should have been operating their train more slowly. No, but the sight distance triangle and the federal regulations are dependent upon the speed of the train and the speed of the highway crossing. The slower the train goes, the smaller distance you need for a safe sight distance. Can I ask you a question on the sight distance, inadequate sight distance claim? I didn't see that in your complaint. Your summary judgment brief didn't address it at all. How is it that's a part of the lawsuit at this point? I think we did address it in both of our – we did talk about the sight distance and the failure to maintain a safe crossing in count two. Well, I know count two deals with failure to maintain a safe grade crossing, but I don't see anything about inadequate sight distance, at least below. Now, I don't want to take up too much of your time here because you only have about a minute to go. We can keep the clock moving if necessary. If I could just have a second. I mean, you have a reply. If you want to sit down and look at it, that's fine too. Okay, let me take a look at it, and I will reply to the court. But the – And the district court didn't deal with it either, you know, as such. I mean, the district court dealt with it in footnote nine and indicated that – and viewed that as a duty to remove a building. What our argument had been to the district court was that there needed to be inadequate sight distance. All of the expert reports talked about the adequate sight distance, the statement of facts, and the facts in this case all indicated there was not an adequate sight distance. Is there – for preemption purposes, is there any regulation, any provision of federal law that somehow links sight distance to the rail class? Not that I'm aware of, Your Honor, to be perfectly honest. And with respect to account three, that's a negligence per se claim, failure to properly mark or secure? You're claiming that the cross bucks were, what, were not a proper warning device? We're claiming that the cross bucks were not properly maintained. Isn't that clear? Not properly maintained. Not properly maintained. So you do not claim that in and of itself the cross buck or cross bucks were not a proper warning device? Because that would seem to me to be a claim that's barred by Shanklin. Would you agree? Well, Shanklin would certainly seem to bar that under most circumstances whenever – but when you look at the regulation itself, 646.214B1, you know, it talks about sight distance being a requirement or when there is inadequate sight distance, you need gates and lights. But to answer your case directly, our claim is based primarily on the fact that the warning device installed here, the cross bucks, was not installed in accordance with the – I'm sorry, I forget the acronym, the MTCDU, that that requires – Counselor, can you be serious on this issue when you concede that this man had crossed or operated his motorcycle over this crossing over a hundred times? I believe the record shows that every time – there was never a train at that crossing. Any time Mr. Zimmerman had crossed that crossing. Furthermore, the crossing had been – But he was familiar. He was familiar there was a crossing. He was familiar that trains do come. He was familiar with the cross bucks. We would say no, Your Honor, in that the cross bucks had been allowed to deteriorate. All the signage leading to the railroad crossing had been allowed to deteriorate. The marks on the road had disappeared, and he thought that the crossing was no longer active. Certainly had the crossing been maintained, that would have given him a clear clue that the crossing was active. Well, if we were playing poker, I was going to say, what's your next highest card? Okay. I just don't think there's anything to this argument at all. That's my own view. I wish I could say otherwise, but I'm out of time. All right. Well, we'll have you back on rebuttal, Mr. Boyle, unless you have something. Thank you, Your Honor. Mr. Hahn? Yes, Your Honor. Thank you very much. Your Honors, Judge Alderser. Hello. I'm Richard Hahn. I'm assisted by Mr. Stroh. Can you perhaps pull the microphone a little? How's that, Your Honor? I think that's better. Thank you. I'll be happy to address any questions the court has in the order that it chooses. I would like to just address this last point here about the cross bucks. We've seen in the brief, the plaintiff alleged that the cross bucks had been allowed to deteriorate. I don't know what that means. There was never any evidence submitted in the case in the court below that there was any deterioration. Did he say there was white tape? The white reflective tape wasn't on it? After this crossing was established by the Pennsylvania Utility Commission with federal funds, thereby bringing in Eastwood and Shanklin, the MUTCD changed. And it said going forward, if you're going to put a cross bucks, you should put red reflectorized tape on it, okay? There was absolutely nothing in that MUTCD or any other statute or regulation that requires people to go back and retrofit, at least not at the time of this accident. Plaintiff had two expert reports in this case. Neither one of them said that at the time of this accident, the railroad was required to do anything with regard to those cross bucks. This argument is clearly preempted, and for the plaintiff's counsel to come in and tell the court there was something that the railroad should have done without specifying it with regard to those cross bucks, I think is, well, it's difficult. Is that even a maintenance issue, or is that really changing the nature of the warning sign or device to the railroad and then entering into an area that really is clearly preempted? You're absolutely right, Your Honor, and that's why plaintiff has to frame this as a maintenance issue. It's not a maintenance issue. He's saying there shouldn't have been cross bucks there. There should have been warning lights and gates, because my client, Mr. Zimmerman, decides he wants to go 35 miles an hour across this crossing. Shanklin makes absolutely clear that once the decision has been made by the state what the appropriate warning device is, and that has been implemented using federal funds, the discussion is over. Now, the railroad does not dispute, does it, that it has a duty to maintain here if what we're talking about is maintenance, that is, to not allow something to fall into such a state of repair. There's no question about it. Then we'd be into a clear area of state law negligence unpreempted, right? Absolutely right. Our burdens are clearly established by the law. We have to maintain that crossing as it has been established by the PUC. Under both state and federal law, we have to keep that crossing, I think it's up to 200 yards on either side of the crossing, free from vegetation and other visible obstructions on our land. When our trains are approaching, we have to give both a visual and an audible indication, and the standards are set by the Federal Railroad Administration as to the decibel level of the horn, as to the brilliance of the light. Norfolk Southern has oscillating lights, which go on the front of this train as soon as the horn is sounded. There has been not one iota of evidence in this case that the railroad failed in any of the duties that are set forth in the federal law or state law. Speaking of the federal law, focusing specifically on CFR 646.214B, what does it require of a railroad in these circumstances? And did it change in any way? What was the railroad's role in these decisions after it took effect? 646.214, as I look at it, Your Honor, is a design plan. The federal government is saying, when you're building a crossing, these are things to be considered. So are these things, does it create a federal standard of care, which is one of the issues here? Well, we know from the Henning case, it certainly does not. Every court that has addressed this has said that it does not set forth a federal standard of care. I believe Shacklin says that. I don't know how more clear. Henning says it in grade from the Eighth Circuit. Correct. Are there any cases on the MUTCD, I don't know if, it's the MUTCD, are there any cases dealing with that, whether that creates a federal standard of care? It does create a federal standard of care. Your signs, let's say you have a stop sign at an intersection, okay, and you're at Township, and the stop sign is printed in green as opposed to red. Okay. Somebody goes through that stop sign not recognizing what it is could establish a breach of duty. Once you have complied with the MUTCD at the time that you install that device, then you are, there's pure preemption. I know you said, Mr. Hahn, that you wanted to start at this point, which was the last issue taken up by your adversary, and before we move to the other matters you do want to address, I wanted to ask Judge Aldiser if he had anything to ask on this. No, I have no questions. All right, thank you. Thank you, Your Honor. Then you may proceed, Mr. Hahn. I don't know if the Court is still interested in the question of the railroad inventory documents or the accident reports. Yeah, I am. I wanted to, you know, we have, we've been in this case for a couple of years, and I have repeatedly been hit over the head by plaintiff's counsel who says that for some 29 years Norfolk Southern has been running people over at this intersection, which I think is, you better be able to back something up if you're going to use it in terms like that. I've looked at these incident reports. Well, that's a jury argument. Right. The records say what they say. I looked at 10 different reports, as I recall. Right. Of two different kinds. So what's the point? What they show, Your Honor, is that from 1975 to 1999 there were a handful of accidents. Conrail owned the property at that time. After this cross buck program, funded by the federal government, was instituted and Conrail upgraded the cross bucks at this intersection, there were two minor accidents, 93 and 94. There was one accident in 1999. Norfolk Southern took over. From that time until 2008, there were no accidents with one exception, Mr. Zimmerman's. So the idea that we have a dangerous intersection here and that we're hiding squirreling documents away so the federal government does not know about it is rather preposterous. Well, again, I got the tone of that in the supplemental briefs we requested. Again, it sounded to me like an argument to a jury, not what we're concerned about here. Now, either those records come in or they don't come in. Either those records are admissible or they're not admissible. The district court said they weren't admissible. And what was the district court's justification for keeping them? 23 U.S.C. Section 409 is a- We have two different types of documents here, right? The accident reports are one type of document. Right. The other type is a cross inventory. What does the statute say as to those reports? The accident reports, Your Honor? Yes, sir. They are precluded from both use, well, admissibility, and discovery. And, again, you are referring to which statute? 201-06, I believe, Your Honor. You're talking about 49 U.S.C. 209-01? 209-01, thank you, sir. I got a question about that. Yes, sir. I see that that protects accident or incident reports from use in a civil action for damages only where, and I'm quoting, the action results from the matter mentioned in the report. Now, all right, maybe that covers the report in the Zimmerman case. Right. But what about all the other reports? Exactly. I don't think that – how does that cover all the other prior reports? I know that there is some confusion on this issue, Your Honor. It doesn't look very confusing to me. It looks like plain text would preclude only the report as to this incident, doesn't it?  If you could give me one second, Your Honor, please. Thank you. Okay. It says, no part of an accident or incident report filed by the carrier under this title or made by the secretary under 209-02 may be used in a civil action for damages resulting from a matter mentioned in the report. Now, the reports of each one of these all talk about the same thing, and that is a highway – They don't talk about the same accident. Not all about the same accident, no, sir. You're not seeking damages for any of the other accidents. Plain if it's not. Plain if it's not. Aren't you better off relying on Section 409, which contains the same exemption and makes a reference to Section 130? Well, Your Honor, if you take the broader view of 409, any type of report that is provided to the government or to a governmental agency as a result of some safety program, and I would argue that all of these accident reports that are sent in to the FRA are all part of a safety enhancement program. There would be no other reason for these reports to be submitted. As you point out, Judge Aldersard, under that view, all of these records, accident and the grade-crossing inventory forms would all be privileged under 409. And the 409 changes. The previous version of 409 referred to Section 152, which was relied on a lot by your friend on the other side. But the new version of 409, effective 2005, refers only to 130, 144, and 148 and does not refer to 152. Would you comment on that? Yes, I believe that 152 is a recodification of 148. I think they just designated it differently, but it's the same act. Right. Yes, sir. You know, a main case relied upon by your adversaries, our Strozik case. How do you get around that? Well, there's nothing to get around. Strozik is fine law and is not in conflict with any of the other decisions by the United States Supreme Court and otherwise on the preemption case. All that Strozik says is just because the inadequate signalization claim is preempted and just because the speed claim is preempted, that doesn't mean that every case is going to get bounced out of court on a state law claim. Fair enough. But let's continue to talk about these evidentiary issues and the invocation of a privilege. Yes, sir. And the Supreme Court's Pierce County v. PN case was discussed in the briefs and I believe also by the district court. Does that provide you with authority to keep out all of these reports, to rely upon privilege in keeping out all of these documents, both the accident reports and the NCI documents? Your Honor, Judge Thomas didn't give us any guideposts as to what would not be privileged, but it's impossible to read here. That's because, if I recall correctly, he followed the government's position in their amicus brief and found a middle ground between the two rather extreme positions taken by the parties. So you're correct, he didn't draw any real clear lines, but I think that what it left us with was concluding that the touchstone in determining what the scope of the privilege is, is the relevant governmental program and its purpose, and whether the document was collected or created for that purpose. Well, we will look at that step by step. What the plaintiff seeks to introduce are documents collected by the government as part of a safety program or procedure and is protected by 130. But who is protected by this privilege? The state or the railroad? Right. This is not an immunity that is conferred upon a party. I understand. We're talking about an evidentiary privilege. An evidentiary privilege. And it's the data itself that is privileged. If you read the language of the statute, it says, in any proceeding for damages, all data, regardless of the source, is privileged. I mean, think about it, Your Honor. The government could have required the railroads to do X, Y, and Z back when they introduced the 1973 Highway Safety Act. It did not. In order to get voluntary cooperation in this scheme of putting together a gigantic database that would cover the 100s of thousands of crossings in this nation, Congress saw fit to give a privilege to all of that data to prevent just what we have here. Someone would come in waving a piece of paper and say, Aha, this means something. Yeah, Guillen said that this is to be construed narrowly, like other privileges. Well, of course, like all privileges. But the question is, you've got to follow along. Was the 1973 Act at Section 130 implicated when this national database was put together? Of course. Was there any authority for putting together a national database other than this? No, there was not. What is the data that's being submitted? The data that's being submitted is every crossing in the nation is being submitted. I think the privilege question here is a tricky one. And as Guillen tells us, I think it requires us to look carefully at the statute and its purpose and so forth. But if you would, setting aside the privilege question for right now, can you explain to me what has been nagging at me, and I hinted at this in my question earlier to Mr. Boyle, can you explain the discrepancies in the classification of the crossing in various documents? Yes. Yes. To answer the question that you asked, Mr. Boyle, there's no – a railroad is permitted by federal authorities to establish track speed as it wishes. Amtrak wants to ride at 80 miles an hour. So it is a unilateral process. It's a unilateral process. But what happens is this. The standards are set forth in the CFRs, and they say if you want to be able to run trains at 100 miles an hour, you have to have this many ties per yard. You have to have this many fixtures on each tie. So does that leave open a misclassification claim, as I believe it is pleaded in Count 1, either intentionally or negligently? I don't understand what a misclassification claim is. It's a question of whether or not – should have been delimited more than it was by the classification that the railroad unilaterally sought out. If the plaintiff's experts, and they were supposedly railroad experts, had come in and said, we looked at the gauge of the track, we looked at the curvature of the track, we looked at the number of ties per square mile, what happens? You would concede that as either an intentional act or as a negligent act, that would not be precluded. That would not be preempted. I'm not sure that I understand what you're – if I could just – Why would anybody muster evidence through experts if you didn't have a factual question that experts could testify to? The experts could testify. If they could show – if they could show that this track was in disrepair and should have been classified Class 1. But my question was, you only get to that point once you've failed on preemption and concede that there's a factual issue here and a negligence claim to be heard. Right. Follow up. Right. Okay. Okay. What happened was at one time, back when Penn Central owned this property and then when Conrail owned it, okay, it was Class 1 track. At some point in the late 90s or the 2000s, that entire section of track, the New Holland Secondary, was upgraded. And it was upgraded to allow it to handle traffic up to 40 miles per hour under the FRA guidelines. Now, it's not as if there's no government oversight. The FRA has track inspectors that come around and say, what do you have this graded at? Well, it's Class 3. And they'll inspect and make sure that it's up to Class 3 specifications. Okay? There's no indication in this case, no suggestion by any expert, that this was not Class 3 track. And we've had the people, the top people in the engineering department at Norfolk Southern testify that this is Class 3 track. But your officer is saying, as you guys said it wasn't Class 3 track. You said it was Class 1. And, in fact, one document in this record that the district court looked at as well, submitted by your client, says Class 1. Right, because that's a mistake. That was created after Conrail had listed it in Track 1 and before the information got to whoever it is that sends in these forms. Why isn't that a jury question if you've got one report out of a number of them that's saying Class 1? Well, Your Honor, if there was some reliance on the fact that this document had been submitted, I understand that. If the plaintiff said, you know, geez, I always thought that this was a Class 1 track and the trains only went 10 miles per hour, I can understand there would be reliance on that. But there's no indication in this case that anybody relied on one piece of improperly submitted information. And then, of course, you've got to get to the question of the privilege. So let me ask you, just because maybe I don't understand the system, is there a duty to report to the government this particular area is Class 3 track or whatever it is? Or only you know that? Yeah, we know that, and when the FRA sends in track inspectors, we'll tell them that this is Class 3 track. But otherwise there's no sort of affirmative duty to tell them? No, no. Okay. And we didn't have a duty to submit that form that the plaintiff relies on, which we claim is privilege. We had no duty to supply that. Frankly, railroad companies don't have to tell anybody how fast they run their tracks. Okay? We were permitted by the federal government. That's surprising for a layperson. At least I'll speak for myself. Well, understand there's an awful lot of federal oversight in all of these operations. The FRA has track inspectors, and other inspectors come through all the time. So, you know, it's a pretty tight system. It's not as if the government just allows railroad companies to go off and do whatever they want to do. It does not. And as Your Honor properly pointed out, if we made a mistake in submitting one of these forms, FRA is going to be pounding us, you know, with sanctions and everything else. The question is, is that information privileged? Can it be used in a proceeding like this for money damages arising out of the subject matter of that report? Judge Aldous, sir, do you have questions on this count? No questions. Thank you, sir. Is there anything else, Your Honors? I don't believe. Thank you very much. Thank you very much. It's a pleasure. Judge Aldous, sir? Pleasure, sir. Mr. Boyle, rebuttal. Thank you, sir. Thank you, Your Honors. Judge Chigares, just to address your issue about whether this was alleged in the complaint, paragraph 52 of the complaint says that the crossing at Dillard Avenue has a, quote, unusually restricted sight distance, close quote, because of buildings lining the tracks all along the northwest side of the street. And that is part of counts. It's count three. Count three. The central issue in here is whether the railroad has a duty to provide an adequate sight distance or to protect the public. We believe that the Stolzik case says that the railroad does. You know, how the railroad does that is up to the railroad. They have the authority to remove the building. They have the authority to alter the train operations. They have the ability to do, take other steps to warn people should they choose to do so. But the duty itself is a duty to provide an adequate sight distance, and the railroad has failed to do that. Even the defendant's own experts admit that. The court also talked a lot about the evidentiary privilege under 409. I think it's important to look exactly at the text of 409 and what 409 protects and what 409 doesn't protect. 409 is a statute that protects data gathered by the state and reported to the FRA. It's not a statute that protects data that's reported directly to the FRA by the railroads in any way, shape, or form. There is currently an obligation for the railroad to report to the FRA certain information, but that did not exist at the time of this accident. So I think when you look at the text of 409 itself, it talks about state agencies, and it talks about reports to the FRA by state agencies. Even the Supreme Court case, Pierce County versus Julian, was a case brought by a state agency to seek prevention from disclosing its engineering studies. If you look at the footnote in the Julian case, the records actually in question were all records generated by the state and reported to the FRA as part of its railroad crossing obligations. In this case, the accident reports have nothing whatsoever to do with 409. They're not reported to the state. Where in the text of 409 is there a limitation to documents submitted or prepared or somehow compiled by the state? I think it references sections 130, 148. Pursuant to sections 130, 144, and 148, that language? And those sections, I said 152. It's now 148. Those sections all relate to state obligations to report when you look at the text of them. And I don't have the exact language here for each one. Each one imposes upon the state an obligation to conduct certain studies and to produce certain documents and to report that to the Federal Railroad Administration. Those documents would be the documents that are covered by 409. And I see that I am just about out of time. If the Court has any further questions. Judge Aldous, sir, any questions of counsel? I have none. Judge Chigares? Thank you very much, Mr. Boyle. Thank you, Mr. Hahn. The case was very well argued. It's a matter, as with all preemption matters, at least speaking personally, that is not without a certain amount of complexity. But your arguments were quite helpful. We thank you, and we'll take the case under advice.